UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WADE B. COOK, and LAURA M. COOK,<br><br>Defendants. | No. CR05-424Z<br><br>ORDER |

This matter comes before the Court pursuant to a Joint Motion in Limine to Exclude Attorney-Client Privileged Communications by Defendants Wade and Laura Cook, docket no. 131. The Cooks' motion seeks to bar the testimony of Tim Berry as a witness and to exclude all fruits of what the Government learned from Mr. Berry's disclosures to the Government.

Tim Berry graduated from Seattle University Law School and became a lawyer on November 14, 1997. The Court held an evidentiary hearing on January 16, 2007 to determine the application of the attorney-client privilege to communications between Tim Berry and the Cooks.

ORDER  -1-

On or about April 1996, while a law student, Tim Berry saw an advertisement about a job with the Cooks' organization. He responded to the advertisement and was hired by a company then known as United Support Associates. He started work as a paralegal in April 1996 and continued in that role through February 1997. In 1997, Mr. Berry became a speaker at Wade Cook Seminars on asset protection and tax savings. In June 1997, Mr. Berry formed Ocean Side Management and continued to provide help to the Cooks.

Beginning by at least mid-1997, Mr. Berry started talking to the Cooks about charitable remainder trusts and estate planning. During 1997, Mr. Berry helped the Cooks form a charitable remainder trust and discussed with the Cooks how to protect their assets. The Court has already ruled that nothing Mr. Berry said to the Cooks, or any of their discussions prior to the date he became a lawyer, November 14, 1997, was subject to the attorney-client privilege.

Prior to becoming a lawyer, Mr. Berry sent the Cooks Exhibit 227. Exhibit 227 was a fax and various attachments including schematics on how a charitable remainder trust could be used to protect the Cooks assets. Mr. Berry also testified, and I find, that he prepared and sent an "Owner's Manual" explaining how the charitable remainder trust would work, Trial Exhibit 229, to the Cooks before November 14, 1997. The Owner's Manual alerted the Cooks to numerous restrictions placed upon the charitable remainder trusts including prohibitions on self-dealing and the need to pay taxes on any disbursements. A version of the charitable remainder trust was also prepared by Mr. Berry and provided by him to the Cooks prior to November 14, 1997.

A version of the charitable remainder trust, Exhibit 426, was mailed by the Cooks' attorney to the Federal Trade Commission in 2002. This document was dated October 14, 1997. Mr. Berry testified that the October 14, 1997 date was consistent with his recollection of the time frame when the document was prepared. See Trial Exhibit 426. Mr. Berry also

provided a letter to Eric Marler, Exhibit 228, around the time the charitable remainder trust was prepared. The letter was sent to Eric Marler, a consultant, friend, and Cook adviser.

Mr. Berry began providing legal advice to the Cooks after he became a lawyer in November 1997. His advice continued through March 1999, when Mr. Berry and the Cooks had a falling out.

Prior to July 2003, Mr. Berry sought out Agent Shipley for the purpose of telling the Government about the Cooks' activities. Mr. Berry met with Government lawyers in July 2003. The notes of the Government representatives reflect that Mr. Berry was told not to reveal attorney-client privileged communications. Mr. Berry discussed with the Government the creation of the charitable remainder trust, the owner's manual, the letters to Wade Cook and Eric Marler, and the work he performed for the Cooks.

Mr. Berry testified at the evidentiary hearing that at no time has the Government asked him to disclose any confidential information with respect to his involvement with the Cooks. Mr. Berry also testified that, to the best of his ability, he has avoided providing privileged information to the Government. Statements by Mr. Westinghouse to the Cooks' attorney, Robert Chicoine, indicate that the Government also believed that the attorney-client privilege did not apply, and that the Cooks were not entitled to rely on legal advice from Mr. Berry before he was admitted to practice law. See Chicoine Decl., docket no. 228, at ¶ 5. I find that the Government attempted to limit Mr. Berry's disclosures to matters occurring before Mr. Berry became a lawyer, or to conversations with third parties, including Eric Marler, which the Government reasonably believed would not be privileged. I also find that certain disclosures were made that involved confidential attorney-client discussions, and documents were provided by Mr. Berry that were prepared after he became a lawyer and would have been subject to the attorney-client privilege.

Mr. Berry met with Zaman Farukhi in early 1999 and discussed the charitable remainder trust he had created for the Cooks. Mr. Farukhi was the Cooks' tax advisor and

ORDER -3-

consultant but had no involvement with the charitable remainder trusts or the tax consequences of creating the documents known as the charitable remainder trusts. Accordingly, any communications between Mr. Berry and Mr. Farukhi were not privileged. See, e.g., United States v. Judson, 322 F.2d 460, 462-63 (9th Cir. 1963); see also United States v. Brown, 349 F. Supp. 420, 425-26 (N.D. Ill. 1972) ("[P]rivilege does not extend to protect an accountant's papers prepared while employed by a taxpayer.").

I find that the Government did not take any action to intentionally interfere with the attorney-client relationship between the Cooks and Tim Berry. The Government did not ask for and did not understand it was obtaining information from Mr. Berry that would invade the privilege. To the extent Mr. Berry told the Government more than he should – to the extent he revealed confidential communications after he became a lawyer – it was done by Mr. Berry. The Government did not improperly induce Mr. Berry to breach his ethical duty of confidentiality to his client.

In this case we have a situation, at most, where Mr. Berry as a lawyer may have breached his attorney's obligation of confidentiality to the Cooks. Any remedy should be tailored to the injury suffered. This case is very close to United States v. Rogers, 751 F.2d 1074 (9th Cir. 1985). In Rogers, the defendant's former attorney, Ira Miller, revealed confidential communications to an IRS agent, in violation of his ethical obligations. Miller was not the attorney representing the taxpayer (Rogers) in the IRS investigation, just as Mr. Berry did not represent the Cooks during the IRS investigation. The fact that Mr. Berry failed to assert the ethical obligation does not transform the investigation into Government misconduct. See id. at 1080 ("Normally, an attorney is in a better position to protect the confidences of his client and to know the scope of his ethical duty to his client than is an IRS agent."). As noted in Rogers, where an attorney breaches his obligation suppression of that evidence at trial is appropriate. Rogers also noted, however, the fundamental distinction between the use of privileged information at trial and its use during the investigation.

ORDER  -4-

The Cooks made no secret about their charitable remainder trust. Mr. Cook on numerous occasions during 1998 and 1999 talked about his charitable remainder trust and described the whole process of putting royalties inside a limited partnership and putting the limited partnership inside the charitable remainder trust.

If the inquiry ended with the disclosures by Mr. Berry after he became a lawyer, I would order that he not be able to testify about events after he became a lawyer. Even here, the Court notes that substantially all of the Berry-Cook communications about the charitable remainder trust occurred before any privilege came into being. However, there is more to the story. In the Spring of 2005 the Cooks, who were represented by new counsel, agreed to meet with the Government and tell their story under oath. Both Cooks, with this new counsel present, met with the Government and testified freely and voluntarily, under oath.

During the Cooks' meetings with the Government, the Cooks testified at length about their communications with Mr. Berry. The Cooks testified regarding their communications with Mr. Berry regarding the formation of the charitable remainder trust, as well as other related communications including tax consequences and the withdrawal of funds. The Cooks' sworn testimony frequently refers to Mr. Berry, with substantial testimony regarding specific communications between Mr. and Mrs. Cook and Mr. Berry. The following are some excerpts from that testimony.

Mr. Cook testified about how Mr. Berry, as an attorney, proposed the structure for the limited partnership and charitable remainder trust.

> A.   * * * Well, Tim Berry had an idea – again, he's an attorney – he had an idea that we could set up a limited partnership, put all the royalties into a limited partnership, and then assign all the units in the partnership to the LDS Church. And we talked about it for a couple of weeks. I had never thought of this, but he came into my office. He made this presentation. I said, "Do you know – how would this work?" He drew out – went on his computer, I guess, and drew out diagrams. "You place the royalties and the copyrights here, and then you donate the units over here to a CRT," and then Laura didn't really understand it. I thought I understood it.

ORDER  -5-

Defs.' Resp., docket no. 209, ex. 1 (Wade Cook Tr. April 8, 2005) at 100-101.  Mr. Cooks' testimony further acknowledged Mr. Berry's role as an attorney.

> Q. Was Mr. Berry an employee of Wade Cook Financial Corporation or was Mr. Berry your personal attorney?
>
> A. I don't even know if he was – I think he might have been one of our employees at one time, but through all of these things here, he was an employee of his own law firm, so –
>
> Q. What was the name of the law firm?
>
> A. It was Anderson Law Group, and it was formed by Bob Anderson to do our seminars, and then he, Berry, and Childers – it was called the Berry Childers law firm – bought out the Anderson Law Group.
>
> Q. What was the experience of Mr. Berry at the time that he proposed this charitable remainder trust to you; that is, what was the nature of his legal practice?  How much experience had he had in trusts, for example?
>
> A. Well, he – for several years, you know, they did all of the trust work, the living trusts and all that, I know for sure.  Now I realize he probably didn't have that much experience with charitable remainder trusts, but he sure acted like he did when he came into my office.  He was all knowledgeable and we could do this and this and this and assign the royalties, and basically, again, our wealth was tied up in our stock.  It wasn't in our entity.

Id., ex. 1 (Wade Cook Tr. April 8, 2005) at 117-18.  Mr. Cook later attributed various other actions and tax consequences to advice given by Mr. Berry.

> A. . . . And there were quite a few works, you know, after that time, that went into the trust – into the limited partnership.
>
> Q. You never saw an appraisal; isn't that correct?
>
> A. I said I didn't.
>
> Q. You never talked with anyone other than Mr. Berry about the valuation of the partnership units that you were contributing to the trust?
>
> A. As I said, Tim and I discussed it and it was not going to be worth it to do that, and to take a deduction for those units, so we decided not to pay the extra expense, so we decided not to take a deduction.

Id., ex. 1 (Wade Cook Tr. April 8, 2005) at 165-66.  Mr. Cook attributed his treatment of funds in the charitable remainder trust and partnership structure to advice given by Mr. Berry.

> A. Again at Tim Berry's direction, he told us that the way to – if we needed money out of the company, because we had obligations, that we can create from Never Ending Wealth to ourselves a line of credit, and that when the royalties were received, we could borrow out the money, and we could create it up to $3 million, which is what he suggested, so from time to time we would do that.  We would document it in a ledger.  When we repaid the loan, we would figure out the interest to that point, and pay back some of the loan, and then we would borrow money and then pay some back.

Id., ex. 1 (Wade Cook Tr. April 8, 2005) at 214-15.

The Defendants rely heavily on the prosecutor's knowledge, having talked to Mr. Berry, that Mr. Berry had told the Cooks specifically that borrowing from the charitable remainder trust was a potential problem.  Id., ex. 1 (Wade Cook Tr. April 8, 2005) at 215:11-13.  The Defendants claim this is the fruit of the Government's misconduct.  However, this question, put in context, only occurs <u>after</u> Mr. Cook stated under oath that Tim Berry advised the Cooks they could establish a line of credit up to $3.0 million and borrow the royalties after they had been put in the trust.

Laura Cook offered similar testimony which put the Cooks' communications with Mr. Berry at issue and disclosed the substance of Mr. Berry's advice.

> Q. You said that Mr. Berry told you something about withdrawing money in the form of loans or that if you did withdraw money, it should be in the form of loans.  Do I have that correct?
>
> A. Yes.
>
> * * *
>
> Q. Did Mr. Berry tell you about the concern of self-dealing that might come into play if there were loans from the limited partnership or the trust to you and Mr. Cook?
>
> A. No.
>
> Q. Was there any discussion by Mr. Berry of self-dealing?

ORDER  -7-

      A.    I don't remember those terms at all.  In fact, the first time I saw it was when you showed me that letter that he supposedly sent to Wade.

Id., ex. 2 (Laura Cook Tr. April 13, 2005) at 130-32.

      The Cooks' disclosure of communications with Mr. Berry was substantial, and included communications covered by the attorney-client privilege.  The Cooks acknowledged Mr. Berry's role as attorney and advisor.  During their interviews, the Cooks apparently did not claim the attorney-client privilege was applicable, although they were represented and counsel was present during their testimony.  These undisputed facts alone are sufficient to effect an express waiver of the attorney-client privilege to the extent it is applicable to the Cooks' communications with Mr. Berry regarding the charitable remainder trust, the limited partnership, and Mr. Berry's advice in that regard.  See United States v. Plache, 913 F.2d 1375, 1380 (9th Cir. 1990).  The Cooks effected a complete disclosure of their communications with Mr. Berry in an attempt to avoid indictment.  Under Plache, the Court finds the attorney-client privilege was expressly waived by Mr. and Mrs. Cook.

      The Cooks argument that a finding of waiver is inappropriate because of Government misconduct is unavailing.  This is not a case in which a defendant's sixth amendment right to counsel is involved.  As the Ninth Circuit observed in United States v. Rogers, 751 F.2d 1074, 1077 (9th Cir. 1985), Mr. Berry was not an attorney representing the Cooks in defending against a criminal charge.  Instead, he was a potential witness because of the past representation.  Id.  Here, as in Rogers, the Court is faced with "only a situation in which a potential witness, who was an attorney, talked to federal agents about past representation of a client; this, at most, involved a breach of the attorney's ethical obligation of confidentiality."  Id.  The attorney-client privilege is violated only if the attorney is required to testify to the contents of confidential communications between him and his client.  Mr. Berry was not required to testify regarding his confidential communications with the Cooks.

      The Cooks' decision to meet with the Government to provide sworn statements must also be considered in light of their knowledge that the Government was meeting with Mr.

ORDER   -8-

Berry.  See Chicoine Decl., docket no. 228, ¶¶ 2-3.  The Cooks were faced with a possible invasion of the attorney-client privilege as a result of Mr. Berry's discussions with the Government.  I find that the Cooks' choice to give sworn testimony, including substantial testimony about communications arguably covered by the attorney-client privilege, was a waiver.  The Cooks may not disclose the substance of an attorney-client communication for purposes of obtaining a benefit (i.e., the dismissal of the indictment) and later retract the waiver to obtain a different benefit at trial.  The Cooks cannot use their communications with Mr. Berry as an excuse for their conduct and then hide behind the privilege at trial.  Wade and Laura Cook expressly waived the attorney-client privilege as it applied to Mr. Tim Berry through their sworn statements to the Government.  There was no "trickery involved to invoke this testimony."  Plache, 913 F.2d at 1380.  While represented by counsel the Cooks chose to disclose the contents of their communications with their attorney.

When the Cooks learned of Mr. Berry's meeting with the Government, they had a few options:

**Option 1:** Refuse to meet with the Government and approach the Court for suppression of any improperly obtained attorney-client information. See Rogers, 751 F.2d 1074.

**Option 2:** Meet with the Government and provide sworn statements.  The Cooks could have refused to disclose attorney-client communications related to Mr. Berry, reserving their right to move to suppress improperly disclosed attorney-client communications.

**Option 3:** Meet with the Government and provide all information, including testimony regarding Mr. Berry, expressly waiving the attorney-client privilege regarding Mr. Berry by providing sworn testimony about their communications with Mr. Berry.

The Cooks chose the third option.  They waived the attorney-client privilege as to Mr. Berry by testifying in great detail about their communications with him.  They did so after they learned Mr. Berry had been meeting with the Government, they did so with the advice of counsel who was advising them with regard to the criminal tax investigation, and they did so in a manner that left nothing of the privileged communications confidential.

By choosing to meet with the Government and discuss the substance of their communications with Mr. Berry, the Cooks expressly waived the attorney-client privilege to the extent it applies to Mr. Berry. Accordingly, the Court DENIES Defendants' Joint Motion in Limine to Exclude Attorney-Client Privileged Communications, docket no. 131.

IT IS SO ORDERED.

DATED this 23rd day of January, 2007.

Thomas S. Zilly
United States District Judge